# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

### No. 22-384V

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
TOMMY E. MARTIN,                    *        Chief Special Master Corcoran
                                    *
            Petitioner,             *        Filed:  December 19, 2025
                                    *
v.                                  *
                                    *
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
            Respondent.             *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*John Beaulieu,* Siri & Glimstad LLP, Louisville, KY, for Petitioners.

*Emilie Williams*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On October 24, 2024, Tommy Martin filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Program").[2] ECF No. 1. Petitioner alleges that a hepatitis A vaccine administered to him on June 28, 2018, caused him to develop a shoulder injury related to vaccine administration ("SIRVA")—a Table claim (although he also alleges a causation-in-fact claim based on the same set of facts).

I have elected to decide the claim on the basis of the filed records, and the parties have submitted briefs in support of their respective positions. Petitioner's Brief, dated May 22, 2025 (ECF No. 60) ("Br."); Respondent's Opposition, dated May 23, 2025 (ECF No. 61) ("Opp."); Petitioner's Reply, dated June 6, 2025 (ECF No. 62) ("Reply").

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

1

Now, having reviewed the record, trial testimony, expert reports, and other briefing, I find the elements of a Table SIRVA are met—albeit a particularly mild SIRVA (and one where some post-vaccination treatment was more likely aimed at subclinical conditions). Accordingly, Petitioner is entitled to compensation.

## I.    Factual Background

*Medical Records*

Mr. Martin was born on November 14, 1960, and has a self-reported, pre-vaccination medical history of anxiety, gout, hyperlipidemia, and hypertension. Ex. 5 at 1477. On June 28, 2018, Petitioner (then fifty-seven years old and retired) received a hepatitis A vaccine from the Mecklenburg County Health Department after a suspected viral exposure. Ex. 3 at 1–3. On his intake forms to receive the vaccine, the words "shoulder aching" are written next to the question of whether the Petitioner was sick. *Id.* at 3. The vaccination record includes a handwritten notation that appears to be an "R" in the box for "Site," suggesting the vaccine was administered in Petitioner's right arm.

About two weeks later (July 12, 2018), Petitioner visited Dr. Manu Patel at CaroMont Family Medicine complaining of epigastric[3] pain (a sore and discolored *left* arm "ever since" his vaccination) and generalized body aches. Ex. 5 at 1476. Dr. Patel's examination revealed full range of motion ("ROM") in Petitioner's extremities. *Id.* at 1479. A note in these records states that Petitioner had a "SEC INF AFTER HEP A SHOT AT OUTSIDE CLINIC - PAIN & ERYTHEMA WITH INDURATION AT INJ. SITE." *Id.* at 1476. Dr. Patel diagnosed Petitioner with cellulitis of the left arm and prescribed cephalexin. *Id.*

Petitioner had multiple medical encounters after his initial post-vaccination encounter. On August 22, 2018 (seven weeks after vaccination), for example, he returned to Dr. Patel for a follow-up regarding his hypertension and hyperlipidemia. Ex. 5 at 1740. There was no mention of shoulder pain. *Id.* On October 10, 2018, Petitioner received an influenza vaccine in his right deltoid. *Id.* at 4499. Again, he did not report left shoulder pain.

Petitioner later returned to Dr. Patel on December 11, 2018, at which time they discussed a multi-year history of chronic lumbar spine pain that radiated to his right leg. Ex. 5 at 1873. Dr. Patel's examination confirmed right-sided lumbar pain, but normal range of motion ("ROM") and no arm edema. *Id.* at 1876. Dr. Patel made an assessment of back muscle spasms, and prescribed

---

[3] The epigastric region, also known as the epigastrium, is "the upper middle region of the abdomen, located within the infrasternal angle, superior to the subcostal plane." *Epigastrium*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=16844 (last visited Dec. 9, 2025).

medications. *Id.* Dr. Patel also administered Petitioner's second hepatitis A vaccine into his left deltoid (the shoulder allegedly impacted by the SIRVA). *Id.* at 1876, 4498.

On January 9, 2019, Petitioner saw Dr. Patel for a bladder infection, for which Dr. Patel prescribed Petitioner Cipro. Ex. 5 at 1940–43. There was no discussion of shoulder pain. *Id.* Weeks later, on February 18, 2019, Petitioner saw Dr. Patel again to retrieve medical records to send to his lawyers regarding shoulder pain since administration of a hepatitis A vaccine more than six months before. Ex. 5 at 2075. Dr. Patel noted in his exam of the Petitioner that he exhibited normal ROM in both shoulders and there was no erythema. *Id.* at 2079. However, there is a note for tenderness in Petitioner's left shoulder at the AC joint. *Id.* Dr. Patel's assessment listed "chronic left shoulder pain," and he referred Petitioner to orthopedics. *Id.*

Petitioner saw orthopedist Dr. Christopher Prato, on February 20, 2019, complaining of left shoulder pain that he reported began in June 2018. Ex. 8 at 12. In particular, he described a numbness and tingling around the posterior aspect of his left shoulder that occurred when he sits, bends, lifts, twists, and is idle, and he rated the pain at a 10/10 at its most painful, a 3/10 at its best, and an 8/10 during the day of his visit. *Id.* A physical examination was positive for a "impingement sign," and a "mild anterior acromial tenderness," but otherwise demonstrated a normal ROM in the left shoulder. *Id.*

On March 13, 2019, Petitioner returned to Dr. Prato. Ex. 8 at 11. He reported improved neck pain but ongoing left shoulder pain. *Id.* Upon exam, he had positive impingement signs and pain with rotation and abduction. *Id.* The assessment was improved neck pain with radiculitis and left shoulder impingement, and he was given a cortisone injection in the subacromial space of the shoulder (side not specified). *Id.* Petitioner returned to Dr. Patel a week later (March 20, 2019) reporting improvement in his pain. Ex. 5 at 2139, 2141. On exam, however, he now demonstrated *reduced* ROM and persistent tenderness of the left AC joint. *Id*. at 2142.

On August 2, 2019 (after a five-month break in care for his shoulder), Mr. Martin went to CaroMont Emergency Department with complaints of "left-sided neck pain and shoulder pain that started for years (sic) and worsening recently." Ex. 4 at 259. He reported the chronic pain to be from repetitive construction work. *Id.* He also asked whether a hepatitis A vaccine could cause neck and shoulder pain. *Id.* at 264. On exam, he exhibited full left shoulder ROM but tenderness with palpation of the left trapezius muscle. *Id.* at 262. The diagnosis was strain of the left trapezius muscle, and he was prescribed a lidocaine patch and naproxen and was instructed to follow up with his sports medicine doctors. *Id.*

On December 27, 2019, Petitioner went back to Dr. Prato. Ex. 8 at 10. He reported improvement in left shoulder pain after his March 2019 cortisone injection. *Id.* On exam, he demonstrated a slightly reduced ROM as compared to his prior exam, and mild impingement signs.

*Id.* The assessment was recurrence of left shoulder pain due to impingement, and he was administered a second cortisone injection and referred to physical therapy ("PT"). *Id.*

From January through February 2020, Petitioner completed 10 PT sessions. Ex. 7 at 163–184. His initial evaluation showed mild reduction in ROM in both shoulders. *Id*. at 184. He reported continued improvement with PT, and he was discharged on February 6, 2020, to a home exercise program with residual impairments in strength and ROM bilaterally and mild pain. *Id*. On February 10, 2020, petitioner presented to his orthopedist. Ex. 8 at 9. Petitioner reported improved left shoulder pain with PT, but occasional pain with certain motions. *Id.* He again related his pain to his vaccination in June 2018. *Id.* Upon exam, he had limitations in ROM with both shoulders. *Id*. The assessment was continued left shoulder pain, and he was referred for an MRI. *Id*.

Petitioner underwent MRI imaging in February 2020. *See* Ex. 8 at 8–9. On February 27, 2020, Petitioner returned to his orthopedist. *Id.* at 8. He reported left shoulder pain for a year which developed shortly after his Hep A vaccination. *Id.* On exam, he reported tenderness with palpation and demonstrated mild impingement and reduced ROM. *Id.* Dr. Prato explained that the MRI revealed left shoulder impingement with AC arthritis and a rotator cuff tear. *Id*. Dr. Prato advised Petitioner that the vaccination likely caused an exacerbation of his pain, but was unlikely to have caused the rotator cuff tear. *Id.* The plan was for surgery to repair the torn rotator cuff, and excise the distal clavicle. *Id*.

On March 13, 2020, Petitioner underwent a left shoulder arthroscopy with subacromial decompression, bursectomy, distal clavicle excision, debridement of the labrum, and rotator cuff repair. Ex. 8 at 14–16. His surgery confirmed MRI findings of moderate supra and infraspinatus tendinopathy, a full-thickness tendon tear, and mild acromioclavicular degenerative joint disease. *Id.* He began post-surgical PT evaluation a week later. Ex. 7 at 89. Thereafter, he participated in twice-weekly PT sessions through September of 2020. *Id.* at 2–149. He made slow progress over the course of 53 sessions, with continued improvement in strength, ROM, and his ability to perform activities of daily living.

Petitioner subsequently followed up with his orthopedic surgeon over the next several months. Ex. 8 at 3–5. He was doing well with PT, and by June 3, 2020, he had "no complaints"—no numbness, no tingling, and nearly full strength. *Id.* at 3. The plan was to transition to a home exercise plan and follow up as needed. *Id.*

*Witness Statements*

Petitioner offered four statements in support of his claim. *See* Statement of Tommy Martin, dated May 23, 2023, filed as Ex. 1 (ECF No. 28-1) ("First Pet. Dec."); Statement of Crystal Martin, dated Mar. 30, 2023, filed as Ex. 2 (ECF No. 27-1) ("Crystal Dec."); Statement of Lisa Parks,

dated May 23, 2023, filed as Ex. 10 (ECF No. 28-2) ("Parks Dec."); Supplemental Statement of Tommy Martin, dated Dec. 20, 2023, filed as Ex. 13 (ECF No. 37-1) ("Second Pet. Dec."). In his personal statements, Petitioner stated he was given the vaccine in his left shoulder, despite what the vaccination record stated. First Pet. Dec. at 2. He also states that he did not have any shoulder pain or problems prior to his vaccination, but after vaccination started experiencing pain, and that he informed the vaccine administrator that his shoulder was really hurting. Second Pet. Dec. at 1. After fifteen minutes of the pain not subsiding, Petitioner claims he told his provider, who made a note in his chart about the vaccination hurting his shoulder. *Id.* at 1–2. Petitioner claimed the pain persisted and that he developed a "severe shoulder injury and cellulitis" from that vaccine. First Pet. Dec. at 1–2.

Petitioner's wife, Lisa Parks, and sister-in-law, Crystal Martin, also submitted statements, averring that Petitioner was complaining of left shoulder pain the evening of his vaccination that has persisted through the time of their statements. Crystal Dec. at 1; Parks Dec. at 1–2. Petitioner also states that he continues to suffer limited ROM and loss of strength in his left arm five years after vaccination, and that he can no longer bowl, garden, or volunteer at his church due to his injury. First Pet. Dec. at 2–3.

## II.    Expert Opinions

### A.    Petitioner's Expert – Dr. Asif Ilyas

*First Report*

Dr. Ilyas, a board-certified specialist in Orthopedic Surgery and Hand Surgery, prepared two written reports for Petitioner in support of the contention that the petitioner suffered left shoulder bursitis with a rotator cuff tear caused by SIRVA. Report, dated May 31, 2024, filed as Ex. 14 (ECF No. 38-1) ("First Ilyas Rep."); Supplemental Report, dated Feb. 14, 2025, filed as Ex. 17 (ECF No. 49-1) ("Second Ilyas Rep.").

Dr. Ilyas received a Bachelor of Science in Biology from Wilkes University and earned his M.D. from Drexel University College of Medicine. Curriculum Vitae, dated May 31, 2024, filed as Ex. 15 (ECF No. 38-2) at 1. After receiving his M.D., Dr. Ilyas completed a General Surgery Internship and Orthopedic Surgery Residency at Temple University Hospital in Philadelphia, PA. *Id.* He later underwent a Hand, Upper Extremity, and Microsurgery Fellowship at Harvard Medical School. *Id.* Dr. Ilyas is board certified in Orthopedic Surgery with a certificate in Hand Surgery and has been a practicing physician since 2006. *Id.* at 2. In addition to evaluating and treating patients, Dr. Ilyas has published over two hundred peer reviewed articles pertaining to orthopedics. *See id.* at 13–35.

Based on his review of Petitioner's records, Dr. Ilyas opined that Petitioner had experienced a bursitis and rotator cuff tear as a result of a SIRVA injury from receipt of the hepatitis A vaccine. *See* First Ilyas Rep. at 3. Dr. Ilyas defined SIRVA as "shoulder pain and limited [ROM] occurring after administration of a vaccine." *Id.* He listed the requirements for a SIRVA diagnosis as a lack of history of pain, inflammation, or dysfunction prior to receiving the vaccine, localized pain arising within a certain timeframe accompanied by a reduced ROM isolated to the affected shoulder, and no other conditions or abnormalities that could explain the symptoms. *Id.* Dr. Ilyas pointed to several indicators of this injury in the records, such as Petitioner's lack of shoulder pain or problems prior to receiving the vaccination, his developing shoulder pain immediately after administration, and continued pain and reduced ROM documented in his left shoulder. *Id.*

Dr. Ilyas then argues that Petitioner's medical records are consistent with a bursitis with a rotator cuff tear diagnosis rather than cervical radiculitis/radiculopathy. First Ilyas Rep. at 4. Dr. Ilyas states that the MRI and arthroscopy results from Dr. Prato's medical records support bursitis and a torn rotator cuff. *Id.* As to how these injuries arose, Dr. Ilyas maintains that the bursitis was directly caused by the vaccine administration. *Id.* He then opines that the rotator was either directly caused by the vaccine administration or from inflammation as a result of the vaccine. *Id.* Dr. Ilyas uses the data from the Atanasoff study to support that the rotator cuff tear was caused by SIRVA. *Id.* (citing S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 Vaccine 8049, 8050 (2010), filed as Ex. 16 (ECF No. 38-3) ("Atanasoff")). Atanasoff reviewed thirteen claims of shoulder pain post-vaccination submitted to the Program in an effort to determine whether the injuries could be caused by vaccine administration. Atanasoff at 8051. Nine of the thirteen patients underwent MRI's post-vaccination, and the authors noted 15% of the nine had MRI findings of a complete rotator cuff tear in the shoulder where the vaccine was administered. *Id.* at 8050.

Even if the rotator cuff injury pre-dated the vaccine, Dr. Ilyas claims that the acute onset of Petitioner's complaints reflected vaccination-induced worsening, distributing antigenic materials into the synovial tissues which resulted in an inflammatory response. First Ilyas Rep. at 4 (citing Atanasoff at 8051).

*Second Report*

Dr. Ilyas employed his second report to affirm his position on Petitioner's injuries and causation, while simultaneously rebutting Respondent's expert's argument that Petitioner did not meet the criteria for SIRVA. *See* Second Ilyas Rep. at 1–2. Beginning with whether or not the Petitioner experienced a reduced ROM, Dr. Ilyas cites three instances in the medical record where Dr. Prado's notes inference a decreased ROM in Petitioner's left shoulder. Petitioner's medical records from his February 20, 2019, visit with Dr. Prado does not document a specific ROM

number in the shoulder, but does mention that Petitioner "can forward flex, abduct, and internally rotate with pain at the extremes along the anterior acromial end"—which Dr. Ilyas places at the shoulder range. *Id.* at 2 (quoting Ex. 8 at 12–13). Similarly, at Petitioner's March 13, 2019, visit with Dr. Prado, the medical records note "impingement symptoms and impingement sign, positive subacromial tenderness, and pain with abduction internal and external rotation," but once again fail to include degrees of shoulder ROM. *Id.* (quoting Ex. 8 at 11). Lastly, Dr. Ilyas pointed to medical evaluation notes from the December 27, 2019, where Dr. Prado re-evaluated Petitioner and included that the Petitioner's "forward flexion to about 160 degrees, abduction of 150 degrees, and internal rotation to L4, all with a little bit of stiffness." *Id.* (quoting Ex. 8 at 10). These medical records, Dr. Ilyas reports, are proof that Petitioner experienced loss of ROM in his left shoulder. *Id.*

Dr. Ilyas next discussed Petitioner's cellulitis diagnosis and lack of reported pain in his visits to his PCP. Second Ilyas Rep. at 2. While Dr. Ilyas concedes that Petitioner's medical records are consistent for cellulitis, Dr. Ilyas notes that pain attributed to cellulitis persisted to the point that an orthopedic consultation was warranted. *Id.* Dr. Ilyas also attributed the lack of reported pain to Petitioner's PCP over the seven months to the fact that Dr. Patel is not an orthopedist or musculoskeletal specialist. *Id.* Dr. Ilyas argues that just because there was no limited musculoskeletal or orthopedic documentation by Dr. Patel does not mean that the Petitioner was not experiencing pain at the time. *Id.* In fact, Dr. Ilyas reiterates that Petitioner received an orthopedic consultation, which he uses to infer that Petitioner's shoulder pain continued from vaccination to that point. *Id.*

Dr. Ilyas then addressed the contention of Respondent's expert (Dr. Geoffrey Abrams) that Petitioner's shoulder rotator cuff tear was likely due to cervical disease. Second Ilyas Rep. at 3. Dr. Ilyas reversed his stance from his first report, now agreeing that there was evidence of degenerative cervical changes from the Petitioner's Medical records. *Compare* First Ilyas Rep. at 4 *with* Second Ilyas Rep. at 3. However, such degenerative changes could have been in Petitioner's shoulder before the vaccine. Second Ilyas Rep. at 3. In Dr. Ilyas's view, it was only after the vaccination that any pre-existing degeneration became symptomatic—meaning the vaccine exacerbated such subclinical conditions. *Id.*

B.    Respondent's Expert – Dr. Geoffrey D. Abrams, M.D.

Dr. Abrams, a board-certified orthopedic surgeon, prepared one written report for Respondent, opining therein that the Petitioner's SIRVA diagnosis is improbable, and that the Petitioner's pain felt over the course of many months is more likely from a combination of cellulitis, rotator cuff tear, and cervical spine disease. Report, dated Oct. 1, 2024, filed as Ex. A (ECF No. 40-1) ("Abrams Rep.") at 6, 11.

Dr. Abrams received a Bachelor of Arts in Human Biology with a concentration in Neuroscience from Stanford University in 2000. Curriculum Vitae, filed as Ex. B (ECF No. 40-2) ("Abrams CV") at 2. He received his medical degree from the University of California, San Diego before completing a surgical internship at Stanford University in 2008. *Id.* at 1–2. Dr. Abrams completed his residency at Stanford University Hospital and Clinics in 2012, and a fellowship at Rush University Medical Center in 2013. *Id.* at 1. Dr. Abrams is board certified in Orthopedic Surgery with a subspeciality in Orthopedic Sports Medicine, and is licensed to practice medicine in Illinois and California. *Id.* at 2; Abrams Rep. at 1. He holds academic appointments at the Stanford University School of Medicine and the Veterans Administration Hospital of Palo Alto. Abrams CV at 1. He also serves as the head team physician for several of Stanford University's varsity teams, and assistant team physician for the San Francisco 49ers. *Id.*; Abrams Rep. at 1. Throughout the course of his career, Dr. Abrams has published more than one hundred fifty peer-reviewed publications on shoulder and other musculoskeletal pathology. Abrams CV at 2–16.

To begin, Dr. Abrams noted that there was no documented ROM loss in Petitioner's left shoulder after vaccination—a required SIRVA element. Abrams Rep. at 6. The required criteria to diagnose SIRVA, Dr. Abrams notes, includes loss of ROM in the shoulder, consistent with literature on the matter. *Id.* (citing Atanasoff at 8049); *see also* Ex. 5 at 1476 ("July 12, 2018— First medical visit following the vaccination in which the exam was 'normal range of motion'"); Ex. 5 at 2075 ("February 18, 2019—Primary care visit with 'L shoulder…no limitation in (range of motion)'"); Ex. 8 at 11 ("February 20, 2019—Orthopedic visit with 'he can forward flex, abduct, and internally rotate with pain at the extremes (of motion)', but no mention of limited range of motion"); Ex. 5 at 2257 ("March 13, 2019—Orthopedic visit with 'full forward flexion, abduction, and internal rotation'"); Ex. 4 at 259 ("August 2, 2019—ER visit with 'full (range of motion) of shoulder'"); Ex. 8 at 10 ("December 27, 2019—Ortho visit with 'forward flexion to about 160 degrees" which is considered normal shoulder range of motion'")).

At most, on February 27, 2020, during Petitioner's visit with an Orthopedic surgeon, a limited ROM in Petitioner's shoulder was documented. Abrams Rep. at 7 (citing First Ilyas Rep. at 2). However, the results of the physical examination for that visit, Dr. Abrams maintained, demonstrated that Petitioner's documented "elevation" of 160 degrees was considered to be within a "normal" ROM. *Id.* (citing to T. Gill et al., *Shoulder Range of Movement in the General Population: Age and Gender Stratified Normative Data Using a Community-Based Cohort*, 21 BMC Musculoskelet. Disord. 676, 676 (2020)).

Another required diagnostic criteria of SIRVA that Dr. Abrams did not see reflected in the medical record was reported shoulder pain *after* vaccination. Abrams Rep. at 7. Petitioner's medical records, Dr. Abrams opined, show that Petitioner's post-vaccination shoulder pain had receded or abated on August 22, 2018, after visiting his PCP. *Id.* at 8. Petitioner visited his primary care physician four times thereafter without mentioning shoulder pain. *Id.* at 7 (Referencing the

August 22, 2018; December 11, 2018; January 9, 2019; and January 23, 2019, visits with Dr. Patel. *See* Ex. 5-1 at 1740, 1872, 1940, 2005). Only after six months, on February 18, 2019, did Petitioner report shoulder pain to his PCP—and during the same visit he first mentioned his lawsuit. *Id.* at 8 (referencing Ex. 5 at 2079).

Cellulitis, Dr. Abrams maintained, was the likely cause of shoulder pain immediately after vaccination. Abrams Rep. at 7. Dr. Abrams defines cellulitis as "an acute and often painful bacterial infection" that is typically accompanied by pain, redness, and swelling of the affected area, but it is generally not associated with ROM loss. *Id.* (citing T. Sullivan & E. de Barra, *Diagnosis and Management of Cellulitis*, 18 Clin. Med. (London) 160 (2018)). Pain from cellulitis tends to last for weeks to months after its onset. *Id.*

Here, Petitioner was diagnosed with cellulitis in his left arm by Dr. Patel two weeks after vaccination, during his first post-vaccination medical visit. Abrams Rep. at 7. In addition, Petitioner's medical records over multiple provider visits did not report shoulder pain for nearly seven months after vaccination. *Id.* (citing Ex. 5 at 1740 (documenting the August 22, 2018, primary care visit with Dr. Patel); Ex. 5 at 1872 (the December 11, 2018, primary care visit with Dr. Patel); Ex. 5 at 1940 (January 9, 2019, primary care visit with Dr. Patel); Ex. 5 at 2005 (January 23, 2019, primary care visit with Dr. Patel)). It would be reasonable to conclude that if Petitioner was experiencing shoulder pain, he would have reported it during one of his appointments closer to time of vaccination. *Id.* at 8. The combination of a lack of reported pain, Petitioner's cellulitis diagnosis, plus Petitioner's documented normal shoulder ROM suggested that cellulitis best explained the immediate pain. *Id.* at 7–8.

Any pain experienced months after vaccination, Dr. Abrams contended, was the result of Petitioner's rotator cuff tear and cervical spine disease. Abrams Rep. at 8, 11. He contended that vaccines cannot cause rotator cuff tears, especially not full thickness rotator cuff tears, as seen in Petitioner's case. *Id.* at 8 (citing American Academy of Orthopaedic Surgeons, Position Statement: Rotator Cuff Tendinopathy and Glenohumeral Arthritis are Unlikely to be Caused by Vaccine Administration 1 (June 2020); National Academies of Science, Engineering, and Medicine, *Evidence Review of the Adverse Effects of COVID 19 Vaccination and Intramuscular Vaccine Administration* (July 11, 2024)). The size of the needle is microscopic in comparison to the size of the rotator cuff, and would be impossible to create a large tear. *Id.* at 9. Dr. Abrams also noted that medical professionals use dry needling techniques (where needles are inserted directly into tendons) to treat certain disorders without causing tears. *Id.* (citing V. Stoychev et al., *Dry Needling as a Treatment Modality for Tendinopathy: A Narrative Review*, 13 Curr. Rev. Musculoskelet Med. 133 (2020)). And Petitioner's imaging did not show evidence of a direct needle injury to the shoulder. *Id.*

In addition, Dr. Abrams contended, even if the tear existed prior to the vaccination, the medical evidence did not support the theory that the vaccine made the shoulder tear symptomatic. Abrams Rep. at 8. If the vaccine triggered symptoms from the tear, then there would be clear evidence in the medical record of consistent shoulder pain after vaccination—but there was not in this record. *Id.* And the tear could itself explain Petitioner's pain. Dr. Abrams noted that rotator cuff tears are the most common cause of shoulder pain. *Id.* (citing R. Murphy & A. Carr, *Shoulder Pain*, BMJ Clin. Evid. 1107 (July 22, 2010)). And just because these tears are commonly found with SIRVA cases, does not mean they have a causal relationship. *Id.*

Dr. Abrams also disagreed with Dr. Ilyas that there was no evidence for cervical radiculitis/radiculopathy, maintaining instead that the cervical pathology could also be an explanation for Petitioner's reported pain. Abrams Rep. at 9. Dr. Abrams listed five post vaccination visits taking place over the course of a year that he believes established a history of neck and nerve complaints from the Petitioner. *Id.* For example, Petitioner's complained of "pain to the posterior aspect of the left shoulder," "left sided neck pain and shoulder pain," and "limitations of both shoulders." *Id.* at 9–10 (quoting Ex. 8 at 9, 12; Ex. 4 at 259). Dr. Abrams also details significant provider findings during these visits, such as a positive cervical spine pathology test on Petitioner's left side, neck stiffness, and limited ROM in his neck on the left side. *Id.* at 9 (citing Ex. 4 at 259; Ex. 8 at 11–12)). Dr. Abrams points out that Petitioner's complaints detail spine and neck pain, but normal ROM in the shoulder are not indicative of SIRVA, but rather cervical degenerative changes. *Id.* at 10–11.

Dr. Abrams further noted that shoulder and neck pain and symptoms can stem from both shoulder or cervical spine/nerves. Abrams Rep. at 10. To tell where the pain and symptoms are originating, criteria has been established to determine if the cause could be cervical radiculopathy or other cervical conditions. *Id.* at 10–11 (citing S. Bokshan et al., *An Evidence-Based Approach to Differentiating the Cause of Shoulder and Cervical Spine Pain*, 219 Am. J. Med. 913, 913 (2016) ("Bokshan")). Criteria found in the majority of patients with cervical conditions will have many of the following: "(A) associated numbness and tingling; (B) burning or electric type pain; (C) restricted cervical spine/neck notion; (D) Positive Sperling maneuver on exam; (E) pain in the lateral portion of the shoulder girdle." *Id.* at 11 (citing Bokshan). Petitioner's medical records show that he exhibited all of these. *Id.*

## III.    Procedural History

After attempting incorrectly to litigate this matter elsewhere,[4] Petitioner initiated his claim in the Court of Federal Claims on August 27, 2021, alleging the same general claim discussed

---

[4] Petitioner filed an action regarding the same claim in the North Carolina Federal District Court on June 16, 2021, but that matter was voluntarily dismissed without prejudice on December 9, 2021. *See Martin v. Health & Hum. Servs. Admin.*, No. 3-21-cv-00287-MOC-DCK.

herein. In December of 2021, Petitioner moved to voluntarily dismiss that Petition resulting in an Order Concluding Proceedings. *See Martin v. Sec'y Health & Hum. Servs.*, No. 21-1777V, 2022 WL 538923 (Fed. Cl. Spec. Mstr. Jan. 24, 2022). Petitioner then initiated the present claim *pro se* on April 4, 2022, before retaining an attorney in September 2022. Respondent filed a Motion to Dismiss on July 27, 2022, arguing that Petitioner's filing was untimely and time-barred. *See* Motion to Dismiss, dated July 27, 2022 (ECF No. 17). Respondent's Motion to Dismiss was denied, and Respondent filed his Rule 4(c) Report opposing compensation on December 13, 2023. *See* Order, dated Jan. 26, 2023 (ECF No. 26); Respondent's Rule 4(c) Report, dated Dec. 13, 2023 (ECF No. 36). The process of filing expert reports began. After filing expert reports concluded, I decided to decide this case on the record. The parties completed briefing in June of this year. This matter is now ripe for resolution.

## IV.    Parties' Arguments

*Petitioner*

Petitioner maintains that he has provided sufficient evidence to prevail on his theory that he suffered a SIRVA Table injury, or, in the alternative, an off-Table SIRVA injury caused by the hepatitis A vaccination he received on June 28, 2018.[5]

Table claims require that a claimant prove that he (1) received a covered vaccination in the United States; (2) suffered an injury he relates to that vaccination; and (3) either suffered effects of this injury for six months, died, or was hospitalized and underwent surgery; and (4) has not received other damages for the injury. 42 U.S.C. § 300aa-11(c)(1)(B)–(E). Further, to satisfy a SIRVA injury, a petitioner must show that (1) he had no history of pain, inflammation or dysfunction of the left shoulder prior to the June 28, 2018 hepatitis A vaccination that would explain the sighs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection; (ii) his left shoulder pain occurred within 48-hours of vaccination; (iii) his pain and reduced ROM are limited to the left shoulder in which the vaccine was administered; and (iv) no other condition or abnormality is present that would explain his symptoms. *See* 42 U.S.C. § 300aa-14(c)(10)(i)–(iv).

Petitioner claims he has satisfied every component required for a SIRVA table claim. Petitioner begins by offering medical records that he claims prove that he received the hepatitis A vaccination in his left arm, which is the same arm in which he experienced SIRVA. Br. at 11. Petitioner acknowledges that his vaccination record indicates that he received the vaccine in his right shoulder, but he claims this was an error. *See id.* To support his contention, Petitioner produced medical records where he stated the vaccine was administered to his left shoulder. *Id.* at

---

[5] Because I find the Table elements are met in this case, I do not include discussion of Petitioner's arguments relating to a causation-in-fact version of the claim.

12. In addition, Petitioner offered statements from himself and Lisa Parks that both attested to the vaccine being administered in the left shoulder, not the right. *Id*. Petitioner also points out that Respondent has offered no evidence to rebut this evidence other than the vaccine administration record. *Id.* Petitioner opines that these records, and lack of rebuttal evidence, are sufficient to prove that he received the hepatitis A vaccine in his left shoulder. *Id.*

Petitioner also claims he has provided sufficient evidence to show that his symptoms occurred within 48 hours and have lasted longer than six months. Br. at 12–13. Petitioner offers his sworn statements and medical records as proof of injury onset within 48 hours. The statements assert that Petitioner was experiencing pain in his left shoulder immediately after vaccination. *Id.* at 12. Further, the vaccine administration record lists "aching shoulder" which Petitioner states was written post-vaccination in his sworn statement. *Id.* (citing Ex. 3 at 3; Second Pet. Dec. at 1–2). Further, medical notes from Petitioner's June 12, 2018, medical treatment had that Petitioner related his onset of symptoms to vaccination. *Id.* at 13 (citing Ex. 5 at 1475–79). And he offers sworn statements to bulwark the claims, along with symptoms severity. *Id.* at 13.

Petitioner further maintains that there is no alternative cause for his SIRVA injury, and that Respondent has not offered a persuasive alternative theory to rebut his Table claim. Br. at 13. The records produced in this matter show that he had no pre-existing shoulder injuries prior to vaccine administration. *See id.* at 14. While Respondent argues that cellulitis was the cause of Petitioner's shoulder pain, Petitioner offered Dr. Ilyas's expert opinion that Petitioner's shoulder pain "persisted beyond" the diagnosis of cellulitis, and was so severe that Petitioner was referred to an orthopedist. *Id.* (citing Second Ilyas Rep. at 2). Dr. Ilyas also opined that any concerns for radiculitis or radiculopathy are unwarranted because those diagnoses are not supported by Petitioner's medical records. *Id.* (citing First Ilyas Rep. at 4). Going further, Petitioner argues that any treatment records that pertain to other conditions that could explain his injury are too vague or sparse to rebut Petitioner's Table claim. *Id.* While Respondent's expert speculates the existence of a pre-existing tear, Petitioner points out that there is a lack of evidence to prove this alternate theory and Respondent has failed to offer an alternate explanation to rebut Petitioner's claim. *Id.*

In his reply, Petitioner argues that the seven-month treatment gap after his initial appointment does not preclude a finding of entitlement. Reply at 1. Petitioner admits that he did not report shoulder pain at every provider visit, but notes that these visits were short, or were focusing on other, more severe issues. *Id.* at 2. Also, Petitioner opines that his cellulitis masked his shoulder injury from Dr. Patel (who was not an orthopedist and therefore may have misapprehended the nature of Petitioner's complaints). *Id.* However, Petitioner holds that his medical records, in addition with his supplemental statements, support his claim of a vaccine caused shoulder injury with pain and sequalae that lasted longer than six-months. *Id.* at 1–2.

Petitioner also reiterates his contention that he has met the requirements for a SIRVA Table claim. Reply at 5. Petitioner reiterates that his medical records support that his pain began immediately after vaccination—before a bacterial infection or cellulitis could develop. *Id.* at 1–2, 5. Further, Petitioner points to medical records from his medical visits in February and March of 2019 that show positive impingement signs as support for documented limited ROM post vaccination. *Id.* at 5–6. Lastly, Petitioner claims that his MRI results, surgery, PT sessions, and visits to the orthopedist confirm that he suffered shoulder pathology that has evidence of a causal connection to vaccination, not cellulitis or cervical pathologies. *Id.* at 6–8.

### *Respondent*

Respondent argues that Petitioner cannot satisfy the elements of a Table claim. Opp. at 8. He begins with the contention that Petitioner has not satisfied the residual injury requirement. The Vaccine Act requires all Petitioners to show that they have suffered the residual injury of the vaccine for more than six months after vaccine administration. *Id.* (quoting 42 U.S.C. § 300aa-11 (c)(1)(D)(i)). Respondent claims that Petitioner's injury, according to the medical records, abated only weeks after the vaccine—falling short of the six-month threshold. *Id.* at 9. Thus, preventing Petitioner from succeeding on either claim.

Next, Respondent argues that Petitioner has not satisfied multiple requisite elements for a Table SIRVA claim, including showing onset within forty-eight hours, pain and ROM limited to vaccination shoulder, and no other condition or abnormality is present that would explain his symptoms.

Respondent claims that record evidence does not establish Petitioner's onset of shoulder pain occurred within forty-eight hours after vaccination, and neither Dr. Ilyas's expert reports nor Petitioner's affidavit testimony is persuasive. Opp. at 13. Respondent asserts that Dr. Ilyas's statement that Petitioner's "shoulder pain began almost immediately following the injection on 6/29/2018, and continued unimproved will past 6 months post-vaccination until his left shoulder surgery on 3/13/2020" is unsupported and conclusory. *Id.* (quoting First Ilyas Rep. at 3). Similarly, Petitioner's sworn statements averring to onset immediate after vaccination cannot be used as persuasive evidence in this claim as they are unsupported by medical records or medical opinion, according to Respondent. *Id.* (quoting 42 U.S.C. § 300aa-13(a)(1); *see also Lett v. Sec'y Health & Hum. Servs.*, 39 Fed. Cl. 259, 260 (1997)). In fact, Respondent claims that Petitioner's own statements have not consistently described his onset. *Id.* at 14. When Petitioner moved to reopen his case on April 4, 2022, he stated in that his shoulder pain began "within a few days of injection." *Id.* (citing ECF No. 1-2 at 26). However, Petitioner's first statement now describes the injury occurring "immediately following the vaccine." *Id.* (citing First Pet. Dec. at 1). Respondent states that this detail changed again in Petitioner's supplemental statement as well. *Id.* (citing Second

Pet. Dec. at 1). This changing detail, Respondent claims, goes towards the unreliability of Petitioner's memory regarding his vaccine and Petitioner's offered sworn statements. *Id.*

Respondent further maintains that Petitioner failed to show his pain and ROM were limited to his vaccinated shoulder. Opp. at 14. At the outset, the vaccination administration record shows that Petitioner received the vaccine in his *right* shoulder, despite the petition describing pain in Petitioner's left shoulder. *Id.* at 15. Respondent adds that the medical records provided in this case and Dr. Abrams's expert report note that Petitioner exhibited a normal ROM in his shoulders during medical visits from July 12, 2018, through December 27, 2019. *Id.* (citing Abrams Rep. at 6).

Lastly, Respondent argues that Petitioner suffers from other conditions or abnormalities that explain his symptoms. Opp. at 15. As discussed by Dr. Abrams, Petitioner's symptoms both soon after vaccination and the reported pain months after vaccination can be attributed to Petitioner's cellulitis, torn rotator cuff, and cervical disease. *Id.* at 15–16 (citing Abrams Rep. at 7–9). The latter two not being vaccine caused. *Id.* (citing Abrams Rep. at 7–9). Respondent points out that Petitioner's providers diagnosed him with cellulitis and noted no ROM issues. *Id.* And Dr. Abrams concluded that the reported timeline, normal ROM, and confirmed cellulitis diagnosis, and lack of reporting of shoulder pain despite numerous medical visits for many months, supports cellulitis as a temporary source of shoulder area pain after the vaccination—not SIRVA. *Id.* at 15–16 (citing Abrams Rep. at 7).

Respondent attributes Petitioner's later-in-time reported shoulder pain to his diagnoses of a torn rotator cuff and cervical disease, both unrelated to vaccination. Opp. at 16 (citing Abrams Rep. at 8–9). Respondent points to Petitioner's medical records and Dr. Abrams expert report as support that the Petitioner was diagnosed with a rotator cuff tear and likely had cervical spine pathology, both of which are known to cause shoulder pain. *Id*. Respondent also points out the medical literature and scientific consensus from Dr. Abrams's expert report that purport to establish that vaccines do not cause full thickness rotator cuff tears *Id.* (citing Abrams Rep. at 9). Petitioner's own orthopedist specifically noted his vaccination was unlikely to have caused his rotator cuff tear. *Id.* (citing Ex. 8 at 5).

## V.    Applicable Legal Standards

### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table

Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[6] Petitioner alleges a Table and causation-in-fact claim.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical

---

[6] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs.*, 121 Fed. Cl. 230, 245 (May 6, 2015) ("[p]lausibility . . . in many cases *may* be enough to satisfy *Althen* prong one" (emphasis in original)).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility. See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (arguing that *Althen* prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at \*2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at \*4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant*, 956 F.2d at 1148. In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.    *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir.

1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less

deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C.    *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are

employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.    *Determination of Claim on Basis of Record*

I have opted to decide entitlement in this case based on written submissions and evidentiary filings, including the expert reports filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See D'Toile v. Sec'y of Health & Hum. Servs.*, No. 15-85V, 2018 WL 1750619, at *2 (Fed. Cir. Apr. 12, 2018); *see also Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that

decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *See Hovey v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417.

## ANALYSIS

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a covered vaccine (a category including the version of the hepatitis A vaccine at issue). 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
> (ii) Pain occurs within the specified time-frame;
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

The Petitioner must meet all Table elements to succeed on a Table claim. And I find all are satisfied (although the injury itself was clearly mild, and therefore damages will appropriately be quite modest).

*Situs*

A preliminary issue to be resolved is whether the Petitioner likely received the hepatitis A vaccine in his left or right shoulder. While the vaccination note states the vaccine was administered in his right shoulder, preponderant evidence supports a left-sided administration.

This is certainly not the first time that the Program has faced a factual issue like this – a conflict between the initial vaccination record and other evidence - and found preponderant evidence that the record was likely inaccurate. *See, e.g.*, *Hanna v. Sec'y of Health & Hum. Servs.*, No. 18-1455V, 2021 WL 3486248, at *13 (Fed. Cl. Spec. Mstr. July 15, 2021) (finding that Petitioner's contemporaneous medical records, supported by sworn witness statements, were preponderant evidence that the vaccine was administered into Petitioner's right arm, contrary to the vaccine administration record); *Mezzacapo v. Sec'y of Health & Hum. Servs.*, No. 18-1977V, 2021 WL 1940435, at *6 (Fed. Cl. Spec. Mstr. Apr. 19, 2021) ("[a]lthough the Rite Aid immunization summary contained in petitioner's medical records states that petitioner received his Tdap and flu vaccinations in the left arm . . . the record as a whole indicates otherwise.") (internal citations omitted); *Mogavero v. Sec'y of Health & Hum. Servs.*, No. 18-1197V, 2020 WL 4198762, at *3 (Fed. Cl. Spec. Mstr. May 12, 2020) (finding that Petitioner's vaccination administration record memorialized the incorrect arm based on Petitioner's post-vaccination medical records). Medical records are not free from human error, as they "are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Hum. Servs.*, No. 03-1192V (Fed. Cl. Spec. Mstr. July 18, 2006). Contemporaneous treatment records are probative when reviewing the accuracy of a conflicting record because they are created by disinterested persons who memorialize a present sense impression of the Petitioner and his condition. *See Hanna*, 2021 WL 3486248, at *9. Looking to Petitioner's medical records, treating providers statements, and sworn witness statements, the overwhelming evidence preponderantly shows the Petitioner was likely vaccinated in his left arm.

Thus, Petitioner first presented to Dr. Patel after vaccination complaining of a sore and discolored *left* arm, and was diagnosed with cellulitis in the left arm the same day. Ex. 5 at 1476. Months later, Dr. Patel noted tenderness in Petitioner's left shoulder at the AC joint and "chronic left shoulder pain" in his assessment. *Id.* at 2079. Later visits to Dr. Patel and, eventually, Dr. Prato and PT, further supports that the vaccination was delivered in the left arm as reduced ROM and

tenderness were noticed in the left arm upon examination. *Id.* at 2079, 2139, 2141–42.; Ex. 7 at 163–184; Ex. 8 at 8–12. In addition, Petitioner's MRI results in February 2020 of his left shoulder showed shoulder impingement with AC arthritis and a rotator cuff tear. Ex. 8 at 8. Dr. Prato opined that the vaccine did not cause these injuries, but certainly exacerbated Petitioner's pain. *Id.* Beyond the medical records and opinions of treating providers, Petitioner and his family members also continuously related the vaccine at issue to his left arm, as documented in Petitioner's medical records and sworn witness affidavits. *See* First Pet. Dec. at 1–2; Second Pet. Dec. at 1–2; Crystal Dec. at 1; Parks Dec. at 1.

Respondent does accurately observe that Petitioner received a second vaccine in his left shoulder a little over five months later, but without issue. However, I find that the second vaccination speaks more to the mildness of Petitioner's SIRVA injury than to situs. Petitioner's ability to tolerate a second vaccination in the affected shoulder is relevant to damages, but does not prevent a favorable situs finding otherwise.

*Onset*

The second disputed issue in this case is whether Petitioner's first post-vaccination symptom or manifestation of onset (specifically pain) of his shoulder injury occurred within 48 hours of his vaccination, as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI). Based upon a review of the entire record, I find that Petitioner has met this Table requirement.

The record as a whole supports the conclusion that Petitioner's pain began within twenty-four hours after vaccination—well within the forty-eight hour SIRVA Table onset requirement. "[S]houlder aching" is written on Petitioner's vaccination note, which Petitioner claims was added by the administering nurse immediately after Petitioner complained of vaccination site discomfort. This post-vaccination pain is also echoed at Petitioner's next doctor visit two weeks later, when he complained of his sore arm "ever since" vaccination, and reiterated to orthopedists months later. And Petitioner, his wife, and his sister-in-law all attested to Petitioner's shoulder pain and "problems" starting the day he received the vaccine. First Pet. Dec. at 1–2; Second Pet. Dec. at 1–2; Crystal Dec. at 1; Parks Dec. at 1.

Admittedly, the record is not consistently precise as to the specific moment of onset, but this does not preclude a favorable finding. The Act does not require that medical records document an exact date and time that the onset of a petitioner's shoulder pain began. And a special master may thus find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such

period." Section 13(b)(2). Respondent's argument that Petitioner has not satisfied onset because it took Petitioner thirty-three weeks after vaccination to present with "shoulder pain" is also equally unpersuasive. As I have previously observed, "the Vaccine Act clearly does not require that symptoms be recorded within a specific timeframe to be preponderantly established. Rather, it requires only that onset *occurs* in the relevant timeframe." *Niemi v. Sec'y of Health & Hum. Servs.*, No. 19-1535V, 2021 WL 4146940, at *4 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) (citing Section 13) (emphasis in original).

*Existence of Loss of ROM*

Petitioner's ROM was assessed multiple times after his vaccination - with varied, and sometimes inconsistent, results. Petitioner's providers actually did not memorialize the existence of left shoulder ROM limitation until 2019, and it was variable in its presence. *Compare* Ex. 5 at 1467, 2075 (finding normal ROM in the left shoulder during July 12, 2018, and February 18, 2019, provider visits), *with* Ex. 5 at 2142 (noting tender left shoulder and limited ROM on the left side in March 2019). From my review of the record, Petitioner's first documented limited ROM isolated to the left shoulder was reported during his March 20, 2019, appointment with Dr. Patel. Ex. 5 at 2142. Earlier visits either document a normal ROM or a limited ROM of Petitioner's neck with pain to the left-sided paraspinals. *See id.* at 1476, 2075; Ex. 8 at 12. Left shoulder limited ROM is also later recorded on December 27, 2019, and February 27, 2020. Ex. 8 at 8, 10.

Dr. Abrams disputed that Petitioner experienced a limited ROM isolated to the left shoulder, arguing that some of Petitioner's exam results did not reflect a limited ROM. Specifically, Dr. Abrams holds that documented limited ROMs of 160 degrees during Petitioner's December 27, 2019, and February 27, 2020, visits are not limitations at all, but are considered normal. Abrams Rep. at 7. Because of this, Dr. Abrams claims that Petitioner's first documented decline in ROM occurred a year and a half after the vaccination at issue, at which time Petitioner's cervical spine disease and rotator cuff could have explained any decrease in ROM. While this is a valid concern, and certainly questionable, Petitioner has put forward documented instances of limits.

The Table does not require that a petitioner's reduced ROM must *occur* within forty-eight hours to prove causation. *See* 42 C.F.R. § 100.3(c)(10)(i)-(iv); *Portee v. Sec'y of Health & Hum. Servs.*, No. 16-1552V, 2018 WL 5284599, at *8, 11 (Fed. Cl. Spec. Mstr. Sep. 14, 2018). Rather, the QAI language only requires that the Petitioner suffers ROM loss *sometime* after vaccination in addition to pain—which Petitioner has done in this case. At most, the documented limited ROM occurring months after vaccination goes towards the mild intensity of Petitioner's SIRVA and will be considered while determining damages.

*Pain and ROM Issues Limited to Affected Shoulder*

This record does include some complaints of pain or symptoms outside of the area of Petitioner's shoulder – but again, there is enough evidence of primary shoulder-oriented concerns to find on this issue in Petitioner's favor. Admittedly, at Petitioner's first post-vaccination medical visit with Dr. Patel, his complaints were oriented more to his arm. But shoulder complaints came to predominate Petitioner's treatment. Further, although there is some observation of loss of ROM in both shoulders, there are multiple visits where ROM limitation is only seen in the left shoulder. Ex. 5 at 2142 (detailing a March 20, 2019, visit with Dr. Patel where left shoulder pain and limited ROM was only seen at the left shoulder); Ex. 8 at 7 (March 5, 2020, visit with Dr. Prato showing an impression of only left shoulder impingement). And while neck pain and stiffness was complained of intermittently, Petitioner's complaints of left shoulder pain persisted even after the neck pain subsided. Ex. 8 at 11 (March 13, 2019, visit with Dr. Prato that showed even after steroid pack to alleviate neck stiffness and pain, Petitioner still complained of left shoulder pain and was observed to have left shoulder tenderness localized to the subacromial area). I therefore find that Petitioner has preponderantly shown that his pain and ROM limitation was sufficiently isolated to his left shoulder.

*Lack of Previous Left Shoulder Pain, Injury, and Dysfunction*

Respondent does not dispute that Petitioner has no history of pain, inflammation, and dysfunction in his left shoulder. And Petitioner's medical records do not reflect a pre-vaccination history of anything that would explain the post-vaccination injury. I therefore find that Petitioner has established this requirement for his Table SIRVA claim.

*No Other Condition or Abnormality is Present that can Fully Explain Petitioner's Symptoms*

Petitioner must also affirmatively rule out other explanations for his pain and related deficiencies. *See* 42 C.F.R. § 100.3(c)(10)(iv). This element of Petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Hum. Servs.*, 175 Fed. Cl. 673, 680 (2025). However, while the another "condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Hum. Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sep. 27, 2023). Indeed, a petitioner may fail to meet this requirement where there is clinical evidence of an undiagnosed alternative condition. *Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions).

However, Respondent does not defeat a Table SIRVA claim by simply noting the presence of shoulder dysfunction beyond vaccine injury. *See Grossmann v. Sec'y of Health & Hum. Servs*., No. 18-13V, 2022 WL 779666, at *16 (Fed. Cl. Spec. Mstr. Feb 15, 2022). Alternative explanations based on conditions or abnormalities intrinsic to the shoulder raise the complex issue of whether Petitioner's "clinical history shows h[is] shoulder pathology wholly explains h[is] symptoms independent of vaccination." *See Lang v. Sec'y of Health & Hum. Servs*., No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020); *see also, Molina v. Sec'y of Health & Hum. Servs*., No. 20-845V, 2024 WL 4223393, at *8 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (finding that petitioner's diagnosis of calcific tendinitis precluded a Table SIRVA under the fourth SIRVA criterion because it is "a condition that can in itself present with acute onset of shoulder pain"). Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless "would not explain" her symptoms. *Durham*, 2023 WL 3196229, at *14.

Here, Petitioner has met his burden of proof for this element. Petitioner was diagnosed with cellulitis by Dr. Patel only two weeks after vaccination, which could be consistent with Petitioner's initial symptoms, since cellulitis is an acute diagnosis that is associated with shoulder pain and no ROM loss. But Petitioner's pain persisted *beyond* a few weeks to a few months (a likely clinical duration for cellulitis). In fact, Petitioner's shoulder pain persisted long enough for him to obtain a referral to an orthopedist, and was thereafter noted to have reduced ROM. Thus, the totality of Petitioner's history suggests his injury was not likely limited to cellulitis, but also was (or primarily was) reflective of symptoms due to the SIRVA.

Respondent also tries to argue that any later symptoms Petitioner experienced could be attributable to Petitioner's rotator cuff tear and cervical spine disease. But these comorbid shoulder pathologies do not wholly explain his symptoms independent of vaccination—specifically, Petitioner's continuous shoulder pain from vaccination and documented ROM loss within twelve months. While Respondent argues that there could have been a pre-existing rotator cuff tear to account for these symptoms, there is not sufficient record evidence to support this theory.

Program determinations frequently find that a SIRVA has been established, even if it occurs concurrent with preexisting degenerative shoulder issues that were subclinical prior to the offending vaccination. And this case's record can support such a finding. The evidence of SIRVA in this case is met, along with other documented problems of cellulitis, rotator cuff tear, and cervical spine disease. While these later comorbidities (which cannot be attributed to the SIRVA) are relevant to damages, they do not impact Petitioner's success in this case of demonstrating a Table SIRVA.

*Petitioner's Symptoms Sequelae Persisted for More than Six Months After Onset*

To satisfy the Act's "severity requirement," a petitioner must show by a preponderance that they "suffered the residual effects or complications of [the alleged injury] for more than 6 months." 42 U.S.C. § 300aa-11(c)(1)(D)(i); *see Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022); *Wagner v. Sec'y of Health & Hum. Servs.*, No. 17-1388V, 2019 WL 3297509, at *5 (Fed. Cl. Spec. Mstr. May 8, 2019). The Vaccine Act's severity requirement goes only to the *persistence* of pain, not its intensity. *See* 42 U.S.C. § 300aa-11(c)(1)(D)(i). "[E]ven mild symptoms that do not require medical care may satisfy the severity requirement," but "ongoing medical treatment for conditions unrelated to the alleged vaccine injury do not." *Wagner*, 2019 WL 3297509, at *5.

After a careful review of the record, I find that this element is met. From the date of Petitioner's vaccine, there is a roughly two-year treatment course for shoulder pain, during which Petitioner endured multiple doctor's visits, two injections, and over fifty PT sessions. Even discounting the Petitioner's roughly eight- and five-month treatment gaps (and allowing for the strong possibility that surgery in this case was the result of non-SIRVA-related shoulder issues), Petitioner still has approximately a year where he was actively visiting providers and undergoing treatment for his shoulder injury—well beyond the six-month cutoff. *See* Ex. 5 at 2139–42, 1740–1943 (documenting the five-month treatment gap and the seven- to eight-month treatment gap, respectively). Further, Petitioner continued reporting to treaters complaints of residual shoulder pain for three years after his final treatment. I can thus conclude on this record that Petitioner's shoulder pain and related symptoms likely persisted for over six months.

**CONCLUSION**

Although Petitioner has prevailed in carrying his entitlement burden, it is very evident from the facts of this case that damages should be modest. The medical records in this case establish that Petitioner suffered a SIRVA injury with mild levels of pain and minimal ROM limits. His injury was, moreover, first documented in February 2019—seven months after vaccination—and it did not last for a significant among of time thereafter, despite his treatment course. That treatment was limited to two shots to alleviate pain connected to the vaccination, plus PT and other treater encounters. By contrast, it is likely that Petitioner's cervical degeneration and rotator cuff tear were what prompted his need for surgery – and such medical conditions *cannot* be attributed to a SIRVA. Petitioner should therefore expect overall to receive (in addition to any SIRVA-related unreimbursed treatment costs) a very moderate pain and suffering award – certainly not in the six figures, and perhaps no higher than the middle five figures at best.

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. The parties shall attempt to resolve damages, and shall file a settlement status report on their progress on or before February 27, 2026.

**IT IS SO ORDERED.**

s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master